IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Jonathan Robinson, Jr., )<br> )<br>                    Plaintiff, )<br> )<br>        vs. )<br> )<br>Carolyn W. Colvin, Acting )<br>Commissioner of Social Security, )<br> )<br>                    Defendant. )<br>_____ ) | Civil Action No. 6:15-1786-TMC-KFM<br><br>**REPORT OF MAGISTRATE JUDGE** |

This case is before the court for a report and recommendation pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.), concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).

The plaintiff brought this action pursuant to Section 205(g) of the Social Security Act, as amended (42 U.S.C. 405(g)) to obtain judicial review of a final decision of the Commissioner of Social Security denying his claim for disability insurance benefits under Title II of the Social Security Act.

**ADMINISTRATIVE PROCEEDINGS**

The plaintiff filed an application for disability insurance benefits ("DIB") on January 30, 2012, alleging that he became unable to work on December 15, 2010. The application was denied initially and on reconsideration by the Social Security Administration. On April 8, 2013, the plaintiff requested a hearing. The administrative law judge ("ALJ"), before whom the plaintiff and Tonetta Watson-Coleman, an impartial vocational expert, appeared at a hearing on September 10, 2013, considered the case *de novo* and, on September 24, 2013, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended. The ALJ's finding became the final decision of the

Commissioner of Social Security when the Appeals Council denied the plaintiff's request for review on February 18, 2015.  The plaintiff then filed this action for judicial review.

In making the determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

(1)  The claimant meets the insured status requirements of the Social Security Act through December 30, 2015.

(2)  The claimant has not engaged in substantial gainful activity since December 15, 2010, the alleged onset date (20 C.F.R. § 404.1571 *et seq*).

(3)  Through the date last insured, the claimant has the following severe impairments:  depression, degenerative disc disease, and degenerative joint disease of the knees (20 C.F.R. § 404.1520(c)).

(4)  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526).

(5)  After careful consideration of the entire record, the undersigned finds that the claimant had the residual functional capacity to perform light work:  sit, stand, and walk each for 6 hours of an 8-hour day; frequently lift/carry 10 pounds; occasionally lift 20 pounds; never climb ladders or scaffolds; occasionally climb ramps/stairs, crouch, stoop, kneel, and crawl; frequently balance; and avoid moving machinery and unprotected heights.  He would be further limited to simple, routine tasks that do not require production or pace work.  He would require a sit/stand option at will but that option would not cause him to be off task for more than 10% of the work day.

(6)  The claimant is unable to perform any past relevant work (20 C.F.R. § 404.1565).

(7)  The claimant was born on October 16, 1967, and was 43 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 C.F.R. § 404.1563).

(8)  The claimant has at least a high school education and is able to communicate in English (20 C.F.R. § 404.1564).

2

(9)    Transferability of job skills is not material to the determination of disability because the Medical-Vocational Rules support a finding that the claimant is "not disabled," whether or not claimant has transferable job skills (*See* SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

(10)    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that claimant can perform (20 C.F.R. § 404.1569 and 404.1569(a)).

(11)  The claimant has not been under a disability, as defined in the Social Security Act, from December 15, 2010, through the date of this decision (20 C.F.R. § 404.1520(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a).  "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions.  An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2)  has a severe impairment, (3)  has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4)  has an impairment that prevents past relevant work, and (5)  has an impairment that prevents him from doing

3

substantial gainful employment. 20 C.F.R. § 404.1520. If an individual is found not disabled at any step, further inquiry is unnecessary. *Id.* § 404.1520(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62, 1982 WL 31386, at *3. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy that the plaintiff can perform despite the existence of impairments that prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. See *Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

4

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4ᵗʰ Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that the conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4ᵗʰ Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4ᵗʰ Cir. 1972).

## EVIDENCE PRESENTED

The plaintiff was 43 years old on his alleged disability onset date (December 15, 2010) and was 48 years old on his date last insured (December 30, 2015) (Tr. 23, 29). He completed one year of college (Tr. 209) and served six and a half years active duty in the Army, six years in the National Guard, and one year in the Naval Reserve (Tr. 41). He has past relevant work experience as a firefighter, warehouse worker, heavy equipment operator, and forklift operator (Tr. 29).

On August 31, 2009, the plaintiff reported that he was lifting some heavy equipment and felt a pull in his lower back. His spine was positive for posterior tenderness and paravertebral muscle spasms (Tr. 586). On September 18, 2009, an MRI showed disc protrusion at the L4-L5 level causing compression of the nerve roots in the thecal sac, most likely including the right descending nerve root (Tr.590).

On September 29, 2009, the plaintiff saw Jeffery Reuben, M.D., for low back pain that radiated to his lower extremities (Tr. 419). He received injections on October 8 and November 5, 2009 (Tr. 416, 418). On November 9, 2009, the plaintiff had pain with prolonged sitting, standing, walking and with transitional movements. He had decreased range of motion, strength, and flexibility (Tr. 354). After physical therapy, the plaintiff was improved, but worried about flare ups if he returned to full duty work (Tr. 438).

The plaintiff returned to full duty work and had a flare-up. He had a hard time getting in and out of the truck and had decreased motion of the lumbar spine. On March 1, 2010, he was switched to light duty with no repetitive bending, no repetitive twisting, and no lifting over ten pounds (Tr. 435). The plaintiff received injections on March 4 and June 10, 2010. The injections helped some, but he still had cramping in his lower back. He was kept at light duty work (Tr. 411, 414, 434).

On August 13, 2010, the plaintiff was treated for pain in the right knee. He was diagnosed with bursitis (Tr. 303-304, 324-325). On August 19, 2010, the plaintiff reported increased low back and right leg pain. He also had knee pain and walked with a right antalgic gait. He had a hard time transitioning from sitting to standing with decreased strength and sensation on the right side (Tr. 433).

On August 25, 2010, Mark T. Dean, M.D., saw the plaintiff for knee pain. The plaintiff had tenderness directly over the patellar tendon (Tr. 315). On August 28, 2010, MRI findings suggested a repetitive stress-type injury to the tibia (Tr. 317). On September 1, 2010, Dr. Dean indicated that the MRI showed a bony ossicle and some bone marrow edema. Surgery was discussed (Tr. 314).

On September 29, 2010, the plaintiff went to the emergency department with pain, swelling, tenderness, and warmth of the left foot. He was diagnosed with cellulitis (Tr. 306-07).

On October 14, 2010, an MRI of the plaintiff's lumbar spine showed a disc protrusion at L4-L6, touching both transiting and exiting nerve roots (Tr. 527).

On October 21, 2010, the plaintiff had low back pain and bilateral leg pain and was having moderate difficulties with light duty. He had a significant decrease in strength, sensation, and range of motion (Tr. 431).

On December 17, 2010, the plaintiff underwent successful L4-L5 decompression with interbody fusion. The surgery was performed by Dr. Reuben (Tr. 309).

6

In January 2011, the plaintiff followed up with Dr. Reuben's office. The plaintiff was walking, but had some decreased strength and was avoiding major bending, lifting, and twisting. Dr. Reuben's physician's assistant stated that the plaintiff was "doing well" (Tr. 428).

On February 2, 2011, the plaintiff reported left knee pain to his orthopedist, indicating that the pain had been "on and off . . . over the years." On examination, the plaintiff exhibited tenderness over the patellar tendon and had no effusion or instability. X-rays were normal. The plaintiff's orthopedist diagnosed patellar tendinitis, recommended physical therapy, and prescribed a course of steroidal medication with a non-steroidal anti-inflammatory drug ("NSAID") (Tr. 312). On February 25, 2011, the plaintiff saw Dr. Reuben in follow-up regarding his spinal surgery and reported no more leg pain. On examination, the plaintiff had trouble transitioning from sitting to standing, and Dr. Reuben ordered physical therapy because of the plaintiff's lack of progress (Tr. 427; 480-83).

On March 3, 2011, the plaintiff was seen at the Veterans Administration Medical Center ("VA") in Charleston for hypertension, lumbar strain, and bilateral knee patellofemoral syndrome. The plaintiff walked with a limp. He used a rolling walker, knee braces, and a back brace. The VA determined that the plaintiff was unable to obtain or maintain gainful employment, physically active or sedentary, due to his lumbar spine condition, and cannot obtain or maintain employment in his prior job because of his lumbar spine and uncontrolled hypertension. He was examined by nurse practitioner Karen Chapman, R.N. (Tr. 380-83). On examination, Ms. Chapman noted that the plaintiff had pain and limited range of motion in his lumbar spine (Tr. 383). Later that month, the plaintiff began physical therapy (Tr. 341-44). Initially, the plaintiff indicated that he experienced pain of a nine on a scale of ten, and he had poor balance, range of motion, and decreased strength. Clinical findings were consistent with a musculoskeletal pattern of impaired joint mobility, motor function, muscle performance, range of motion, and reflex integrity

associated with spinal disorders.  A TENS unit was recommended (Tr. 334-42).  By the end of April 2011, his pain, range of motion, balance, and strength had all improved.  Specifically, his pain was at worst a three out of ten, his flexibility restrictions were only mild to moderate, and his therapist assessed his prognosis as good.  He was discharged from physical therapy to begin a different program (Tr. 331, 425).

In follow-up with Dr. Reuben on April 15, 2011, the plaintiff exhibited "grade 5 strength" (normal strength), and an MRI and x-ray indicated that "[e]verything seems to be healing very nicely" and "looks fine." Dr. Reuben would have let the plaintiff perform "light duty" at work, but since there was no light duty at the plaintiff's job, he kept him off work (Tr. 425).

Thereafter, the plaintiff began his new physical therapy program (Tr. 468-72). On examination, the plaintiff had decreased flexibility and range of motion and some tenderness, but his strength was normal; his gait was symmetrical and ambulated without an assistive device; and he completed an endurance treadmill test (Tr. 470).  The plaintiff's physical therapist recommended treatment three times a week for four weeks (Tr. 472). The plaintiff was discharged from physical therapy on April 26, 2011, due to his plateau in progress.  He continued to have decreased walking velocity/endurance, difficulty with transitional movements, and difficulty with squatting and climbing secondary to his postoperative weakness.  He could perform occasional standing and walking.  Restriction did not allow for pushing, pulling, or lifting from floor level (Tr. 331, 468-472).

On June 1, 2011, the plaintiff visited the VA clinic and complained about back pain aggravated by movement (Tr. 374-77).  He reported improvement in his pain through use of a TENS unit (Tr. 377).  His treating physician did not recommend any treatment for the plaintiff's pain beyond the medication prescribed by Dr. Reuben.  Percocet, oxycodone, and Flexeril were prescribed (Tr. 376-77).

In a follow-up visit with Dr. Reuben's office in July 2011, an MRI and x-ray of the plaintiff's lumbar spine showed he was "coming along" (Tr. 423, 425, 475). The plaintiff reported going to the gym, riding a bicycle, doing work conditioning, climbing the stairs of a lighthouse, and that his back pain was only off and on due to activity. He was kept from work, but only because "there is no light duty for him to return to" at work. The plaintiff was scheduled for a functional capacity evaluation with a physical therapist (Tr. 423).

At the functional capacity evaluation on August 4, 2011, the examining physical therapist, Jennifer Mayhew, P.T., A.T.C., concluded that the plaintiff could perform light work. The plaintiff demonstrated the ability to occasionally lift up to ten pounds six inches to waist, 20 pounds waist to shoulder, carry up to 20 pounds, push 35 pounds of force, and pull 41 pounds of force. He failed to complete the single stage treadmill test at a level that could accurately predict his functional aerobic capacity. Deficits identified were decreased lumbar range of motion, decreased lower extremity strength, and decreased flexibility. Ms. Mayhew noted that the plaintiff demonstrated inconsistent performance with testing and stated that the capabilities outlined in the evaluation would be considered his "minimal functional ability level" (Tr. 454-60).

The plaintiff followed up with Dr. Reuben on August 16, 2011. Dr. Reuben indicated that the plaintiff's functional capacity evaluation stated that he could work in the "light physical demand level," but that he likely will not improve medically to perform more strenuous work. Dr. Reuben noted that the plaintiff had an inconsistent performance, which meant the capabilities outlined in the evaluation would be considered his minimal functional ability level. He talked to the plaintiff about it, and the plaintiff stated to Dr. Reuben that "he was having a bad day but does not really remember." Dr. Reuben recommended a repeat assessment in four months, but there is no indication in the record that the plaintiff obtained a repeat assessment (Tr. 449).

9

The record contains an incomplete copy of a letter from the Department of Veterans Affairs to the plaintiff, dated April 11, 2012, which stated that the plaintiff was entitled to disability benefits. This letter indicated that the plaintiff was assessed as temporarily 100% disabled due to his spinal degenerative disc disease after his surgery in December 2010 (Tr. 170-72). Records from the VA show that, on a permanent basis, the plaintiff's spinal condition was rated at 40% disabling, his sciatica at 10% disabling, his hypertension at 10% disabling, and his knees at 10% and 20% disabling (Tr. 706). On April 27, 2012, a letter from the Department of Veterans Affairs indicated that the plaintiff's combined service-connected evaluation was 70% and that he was considered to be totally and permanently disabled due to his service connected disabilities. His monthly award amount at that time was $3,439.00 (Tr. 655-58; *see also* Tr. 170).

On June 28, 2012, the plaintiff saw an examining consultant physician, Harriet Steinert, M.D. (Tr. 606-09). X-rays of the plaintiff's lumbar spine and right knee were unremarkable (Tr. 610-11). The plaintiff reported back pain that radiated down both legs to his ankles. He wore a soft brace all of the time. He reported being depressed, and his affect was very flat. He had pain in both knees and limited range of motion. He had significant tenderness to palpation of the lumbar spine. Straight leg raises could not be done as he developed muscle spasms in his back with lying down so he had to sit back up. He had positive straight leg raises in a sitting position at 60 degrees. He could not walk on his toes and heels. He could not perform tandem walking or squatting due to pain. Dr. Steinert diagnosed him with degenerative disc disease of the lumbar spine, bilateral knee pain, alcohol abuse, and depression (Tr. 608-11).

The plaintiff underwent a mental status examination on July 3, 2012, by Scott Shaffer, Ph.D.(Tr. 612-15). The plaintiff walked with a limp, used a cane, and appeared uncomfortable (Tr. 612). The plaintiff described mild depressive symptomatology including decreased energy, frequent sleeping, and chronic fatigue. Dr. Shaffer concluded that the

plaintiff was "mildly despondent because of his situation" (Tr. 614). Dr. Shaffer opined that the plaintiff was capable of performing limited simple chores depending on his pain level. Dr. Shaffer believed that any impairment in mental functioning was more likely to be caused by the plaintiff's physical pain rather than a mental impairment. Independent initiation and participation in vocational and educational endeavors would more likely depend upon his physical condition and level of pain. Concentration and timely task completion might be difficult for him because of his pain level. The plaintiff was diagnosed with adjustment disorder with depressed mood ( (Tr. 613-14).

On July 11, 2012, expert psychological consultant, Olin Hamrick, Jr., Ph.D., reviewed the plaintiff's records and opined that the plaintiff's depression was not a severe impairment based on Dr. Shaffer's assessment. Dr. Hamrick opined that the plaintiff had mild restriction of activities of daily living, mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence or pace (Tr. 77).

Jean Smolka, M.D., an expert medical consultant, reviewed the plaintiff's medical records on July 30, 2012 (Tr. 78-81). Based on that evidence, Dr. Smolka concluded that the plaintiff could lift or carry 20 pounds occasionally and ten pounds frequently; sit, stand, or walk for six hours in an eight hour workday; frequently climb ramps or stairs, balance, and crouch; and occasionally climb ladders, ropes, or scaffold, stoop, kneel, or crawl (Tr. 79).

On August 27, 2012, David R. Price, M.Ed., C.R.C., a certified rehabilitation counselor, performed a vocational assessment and opined that the plaintiff was in no shape to return to the workforce. He suffered from chronic pain, severe limitations, and side effects of pain medications. Physically, the plaintiff was functioning below the sedentary level. His weak back and legs made him a high risk for falls and additional injuries. The plaintiff had not demonstrated the ability to meet attendance expectations or to work at a consistent pace that would allow him to meet the productivity demands of the workplace.

Mr. Price opined that the plaintiff would require an extreme level of workplace accommodation and modification that could not be attained in an environment of gainful competitive employment. Mr. Price stated that he did not believe the plaintiff had the capacity to consistently perform work eight hours per day, 40 hours per week, and maintain that status consistent with attendance and production demands of gainful employment. Based on the available information and with a reasonable degree of vocational certainty, it was Mr. Price's opinion that the plaintiff was completely incapable of obtaining, performing, or sustaining any form of gainful employment (Tr. 616-22). The plaintiff also submitted letters from friends and former co-workers who gave accounts of his functioning (Tr. 272-73, 276-77).

The plaintiff visited the VA clinic on September 19, 2012, complaining of back spasms for the past month. The plaintiff reported that he was taking over-the-counter Motrin, Advil, and Bayer aspirin for his symptoms, but also that he was using a cane to get around. He had difficulty getting out of bed and was very uncomfortable. He was very tender to touch and had limited range of motion (Tr. 643-46). His treating physician prescribed a short course of opioid pain medication and a muscle relaxant (Tr. 647).

The plaintiff visited the hospital on December 27, 2012, complaining of severe back pain that radiated to his right leg. On examination, the plaintiff had painful range of motion and positive straight leg raises that produced pain bilaterally. He had normal spinal alignment, no muscles spasms, normal strength, and normal gait. The plaintiff received pain medication, a short course of steroids, and Valium (Tr. 623-25).

On January 3, 2013, the plaintiff stated that his low back pain radiated down his legs (Tr. 642).

On January 4, 2013, a second expert psychological consultant, Judith Vonn, Ph.D., reviewed the plaintiff's medical records and concurred in Dr. Hamrick's assessment that the plaintiff's depression was not severe. She also found that the plaintiff had no

restriction of activities of daily living, mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace (Tr. 94-95).

In March 2013, another expert medical consultant, Mary Lang, M.D., reviewed the plaintiff's medical records, and opined regarding the plaintiff's functional capacity (Tr. 96-99).  Dr. Lang reiterated Dr. Smolka's conclusion that the plaintiff could perform light work with postural limitations, but also found that the plaintiff should avoid concentrated exposure to hazards, such as machinery and heights (Tr. 98).

On April 26, 2013, the plaintiff was seen at the VA emergency department for pain in his right knee and worsening lower back spasms.  He also had headaches and left neck muscle pain with movement.  The plaintiff reported that he was not taking any medication daily for pain except for taking Advil or "BC" occasionally.  The plaintiff's attending physician prescribed pain medication (an "nsaid and flexeril and limited oxycodone") as treatment and ordered diagnostic tests (Tr. 700-705).

On July 23, 2013, the plaintiff returned to the hospital requesting refills of his pain medication for radiating back pain.  On examination, the plaintiff was in no acute distress, and his back pain was "moderate."  The plaintiff's range of motion was normal; straight leg raises were negative; he had normal spinal alignment; he exhibited no tenderness; and he had no muscle spasms.  The plaintiff's attending physician refilled his pain medication (Tr. 660-62).

On August 21, 2013, the plaintiff was seen at the VA for knee and back pain. He seemed very depressed and complained of loss of appetite and irritability.  The plaintiff reported vague thoughts of suicidal ideation and was referred for a psychiatric assessment. The plaintiff was diagnosed with depression, but he was not actively suicidal.  His treating psychiatrist recommended that the plaintiff start taking medication (Tr. 707-12).  At a follow-up therapy session, on September 4, 2013, the plaintiff reported improvement in his symptoms.  The plaintiff's treating psychiatrist noted that the plaintiff was still depressed,

but "improved greatly," and was responding well to his medication with no side effects. The plaintiff reported that his muscle spasms caused him to jerk or twitch and this was embarrassing in social settings (Tr. 667-70).

On September 23, 2013, the plaintiff returned to the VA clinic regarding his back pain, rating the pain as a four on a ten-point scale.[1] The plaintiff's physician continued the plaintiff on NSAIDs for his lower back pain (Tr. 747-48).

The plaintiff testified at the administrative hearing that he could not work because of his spinal injury. When he was a firefighter, he could no longer pass the physical fitness test. The pain medication made his blood pressure uncontrolled. After he left the fire department, he worked for Beaufort County driving and got his Commercial Driver License ("CDL"), but they told him that he could not perform the duties because of his medications. He was normally in pain, and he missed work from having to see doctors. The plaintiff still had his CDL, but he knew he was not performing up to par as a driver because of his spinal injury. He missed days from work. A lot of times he would have to stop driving and go back to the shop because of his back situation. The VA found him to be 70% disabled and that he was not employable. His injury was service related. He used to jump out of helicopters, and he had a bad landing. He continued to work, and his back problems worsened. One time he stepped in a hole and twisted his back and his knees. While he worked as a firefighter his condition worsened. The VA first rated his disability at 40%, but after it affected his duties as a firefighter they changed it to 70%. The plaintiff had fusion surgery at L4-L5, and the vertebrae seemed to have fused (Tr. 42-45).

---

[1] This doctor's visit occurred the day before the ALJ issued his decision on September 24, 2013, and, thus was not included in the medical records submitted to the ALJ. However, the plaintiff submitted records of this visit to the Appeals Council, along with records of medical treatment that occurred after the date of the ALJ's decision. The Appeals Council made the evidence part of the record (Tr. 4-5, 728-64).

The plaintiff used a TENS unit which, with medications, gave him a little relief. He tried to use the TENS unit for 20 minutes at a time, then he would rest for an hour. During the day he was off his feet about six hours. He would mostly sit in a recliner with his feet up. If he took his medication, he would sleep. Side effects of medication included sleepiness and nausea. The plaintiff experienced muscle spasms throughout the day. He took medications, such as muscle relaxers, and the spasms died down for about an hour or two and then he would fall asleep. When he woke up the spasms came back (Tr. 50-53).

The plaintiff had a history of alcohol abuse. He also suffered from depression. He saw a psychiatrist every two weeks and a counselor at the VA clinic. He was taking a new medication for the depression. The medication helped sometimes, but the depression worsened the longer he was out of work (Tr. 53-55).

The plaintiff testified that after his surgery he had a hard time with pain. He was medicated a lot, but he was able to walk after about a week. His doctor told him to use his cane. He still had pain, especially in the surgery site. The doctor told him to continue to use a cane as needed, but to try to wean himself off from using it. The plaintiff was going to try to do some stretching exercises and physical therapy. The plaintiff stated that he had a worker's compensation case from when he re-injured himself at Beaufort County, but the case had settled (Tr. 55-57).

The plaintiff also received compensation from the VA for his knees. His left knee was worse than his right. The doctors talked about surgery, but after having had the back surgery, the plaintiff did not want to have another surgery. Sometimes when he was walking, his knee would give out and he would fall. He needed assistance when climbing steps. The plaintiff stated that he could walk about 25 steps without having to stop. He stopped twice between his car and the hearing office. The plaintiff testified that he could sit for 30 minutes or so before he had spasms and back pain. During those 30 minutes, he could not really concentrate fully. If he sat or laid down for too long, or if he walked too

much or bent over too far, the pain was worse. He did not do housework. He might fold clothes while he sat on the couch if the clothes were on the couch. His wife and daughter did the cooking. During the day, the plaintiff was sleeping or sitting on the porch and watching television. He went to bed around 7:00 or 8:00. He had new medication to help him sleep through the night. He usually woke up around 4:00 in the morning, but the new medication helped him sleep until 8:30 or 9:00. His wife helped him with personal hygiene if she was home. He also had a raised toilet seat so that he did not have to bend over too much. He read the sports section and the Bible. He used to love to fish and coach football, but he could not do those things any longer. He tried to be at church as much as he could. He had been an usher at church, but he no longer performed the duties. He used to be an officer in the American Legion, but he was no longer able to make all the meetings. He did not go to many places socially (Tr. 57-64).

The vocational expert classified the plaintiff's past work as that of fireman, warehouse worker, heavy equipment operator, and forklift operator (Tr. 64). The ALJ proposed the following hypothetical:

> Assume an individual of the claimant's age, education, and work experience able to do light work. No climbing ladders, ropes, or scaffolds, occasional climbing ramps or stairs, frequent balancing, occasional stooping, crouching, kneeling and crawling. . . . Avoid concentrated use of moving machinery and unprotected heights. Work limited to simple, routine, repetitive tasks. No production rate or pace work . . . .

(Tr. 64-65). The vocational expert stated that the individual could not perform the plaintiff's past work, but could perform work as an electrical assembler, SVP of 2, unskilled, light, DOT of 729.687-010, with 2,310 jobs regionally and 187,920 jobs nationally; small products assembler, SVP of 2, unskilled, DOT of 706.684-022, with 1,570 jobs regionally and 235,910 jobs nationally; and wire worker, SVP of 2, unskilled, DOT of 728.684-022, with 2,740 jobs regionally and 229,240 jobs nationally (Tr. 65).

16

The ALJ proposed a second hypothetical:

Assume a person of the claimant's age, education, and work experience able to do sedentary work. Same postural limitations I just gave you in the first hypothetical. Same environmental, and same non-exertionals.

(Tr. 65).

The vocational expert stated that the individual could perform work as a telephone quotation clerk, SVP of 2, unskilled, with 15,900 jobs regionally and 973,800 jobs nationally, DOT of 237.367-046; weight tester, SVP of 2, unskilled, with 8,750 jobs regionally and 434,710 jobs nationally, DOT of 539.485-010; and addresser, SVP of 2, unskilled, with 500 jobs regionally and 96,330 jobs nationally, with DOT of 209.587-010 (Tr. 65-66). The ALJ asked if, due to a combination of medical conditions and associated pain, a person were to be off task for more than an hour a day, would there be jobs. The vocational expert stated that it would eliminate all jobs (Tr. 65-66).

The plaintiff's representative asked about the portion of the first hypothetical question that limited the individual to no pace work and the vocational expert's testimony that the individual could perform assembly work like electrical assembler and small products assembler. The vocational expert stated that they were not production line jobs, they were bench jobs. The representative asked if the jobs identified in response to the first hypothetical required the individual to stand six out of eight hours. The vocational expert reported that, in her experience, the jobs had a sit/stand option (Tr. 66-68).

## ANALYSIS

The plaintiff argues that the ALJ erred by (1) failing to properly evaluate the VA finding of disability, (2) failing to include the limitation of sit/stand option in the hypothetical question to the vocational expert; and (3) failing to properly explain his residual functional capacity ("RFC") assessment.

17

### *VA Disability*

The plaintiff first argues that the ALJ failed to properly evaluate the VA's disability determination as required by the Court of Appeals for the Fourth Circuit. The ALJ's decision, which is dated September 24, 2013, was issued a year after the decision in *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337 (4th Cir. 2012), in the which the court found as follows:

> The VA rating decision reached in Bird's case resulted from an evaluation of the same condition and the same underlying evidence that was relevant to the decision facing the SSA. Like the VA, the SSA was required to undertake a comprehensive evaluation of Bird's medical condition. Because the purpose and evaluation methodology of both programs are closely related, a disability rating by one of the two agencies is highly relevant to the disability determination of the other agency. Thus, we hold that, in making a disability determination, the SSA must give substantial weight to a VA disability rating. However, because the SSA employs its own standards for evaluating a claimant's alleged disability, and because the effective date of coverage for a claimant's disability under the two programs likely will vary, an ALJ may give less weight to a VA disability rating when the record before the ALJ clearly demonstrates that such a deviation is appropriate.

*Bird*, 699 F.3d at 343.

As noted above, the record contains a letter from the Department of Veterans Affairs to the plaintiff, dated April 11, 2012, which indicated that the plaintiff was assessed as temporarily 100% disabled due to his spinal degenerative disc disease after his surgery in December 2010 (Tr. 170-72).  Records from the VA show that, on a permanent basis, the plaintiff's spinal condition was rated at 40% disabling, his sciatica at 10% disabling, his hypertension at 10% disabling, and his knees at 10% and 20% disabling (Tr. 706). On April 27, 2012, a letter from the Department of Veterans Affairs indicated that the plaintiff's combined service-connected evaluation was 70% and that he was considered to be totally and permanently disabled due to his service connected disabilities  (Tr. 655-58; *see also* Tr. 170). The ALJ found as follows with regard to the VA's disability determination:

18

> I have also considered the claimant's award of benefits from the Department of Veterans Affairs due to a finding that he is disabled. Determinations of disability made by other agencies are not binding on the Social Security Administration or determinative of disability under Social Security Law (20 CFR 404.1504 and 416.0-4). A determination of disability must be based on Social Security Law and Regulations and not on findings of another agency. However, pursuant to Social Security Ruling 06-03p, I have considered the fact that the claimant is currently receiving Department of Veterans Affairs benefits due to his medical condition. I find that the receipt of such benefits provides some insight into the severity of the claimant's impairments and how they affect his ability to function. However, I note that the Department of Veterans Affairs finding of disability provides a different standard for determining the claimant's ability to engage in work activity.

(Tr. 29).

The plaintiff argues that, under *Bird*, the ALJ cannot simply cite the fact that the VA is a different agency as a basis for dismissing the opinion and instead must give the VA determination substantial weight unless he can clearly demonstrate that such a deviation is appropriate (doc. 14 at 18). The Commissioner argues that, under *Bird*, an ALJ is not required to articulate specific reasons for according a VA disability rating less than substantial weight "when the record as a whole supports that conclusion" (doc. 15 at 13). However, a finding that the record clearly demonstrates that a deviation from the substantial weight standard is appropriate " is a finding that must be made by the ALJ, not by this Court in the first instance." *Gilliard v. Colvin*, C.A. No. 8:14-1290-RMG, 2015 WL 4661822, at *11 (D.S.C. Aug. 4, 2015).

The Commissioner argues that the ALJ in *Bird* summarily dismissed the VA rating decision based on the fact that it was not effective until one year after the plaintiff's date last insured, while the ALJ in the instant case concluded that the plaintiff's receipt of VA benefits provided some insight into the severity of the plaintiff's impairments (doc. 15 at 12-13 (citing *Bird*, 699 F.3d at 343-44)). The Commissioner further argues that the ALJ

19

here rightly determined that, due to the differences between the two disability programs, the final determination by the VA that the plaintiff was disabled was not dispositive (*id.* at 13-15).

The ALJ did not discuss in any detail why or how he assigned weight to the VA rating decision; instead, the ALJ simply dismissed the import of the VA decision in a conclusory fashion for being made by another governmental agency and not based on Social Security law (Tr. 29). *See Lawson v. Colvin*, C.A. No. 0:14-CV-4662-DCN-PJG, 2015 WL 7769234, at *4 (Nov. 17, 2015) (noting only reason offered by ALJ for affording the VA rating decision little weight was the differences in the procedures employed by the agencies, which is insufficient under *Bird*), *R&R adopted by* 2015 WL 7776897 (D.S.C. Dec. 2, 2015); *Gilliard*, 2015 WL 4661822, at *11 (remanding for evaluation of VA ratings in accordance with the *Bird* standard).  Like the plaintiff in *Bird*, the plaintiff here has a substantial VA disability rating, and it appears that the VA rating decision is based on the same conditions relevant to the Social Security decision.  However, the ALJ's decision "does not indicate that . . . [the ALJ] considered 'substantial weight' to be the starting point for weight give[n] to VA ratings." *McClora v. Colvin*, C. A. No. 5:14–cv–441–DCN, 2015 WL 3505535, at *16  (D.S.C. June 3, 2015).  Furthermore, the ALJ's discussion "does not 'clearly demonstrate' that . . . a deviation from a finding of substantial weight is appropriate." *Id*. (quoting *Bird*, 699 F.3d at 343).

Accordingly, the undersigned recommends that this case be remanded with instructions for the ALJ to follow the specific method for weighing VA disability ratings prescribed in *Bird.  See Lawson*, 2015 WL 7769234, at *4 (recommending remand for assessment of VA disability rating in accordance with the *Bird* standard); *Sims v. Colvin*, C.A. No.  2:14-CV-03005-TLW, 2015 WL 5474760, at *6 (D.S.C. Sept. 17,  2015) (remanding for assessment of VA disability rating in accordance with *Bird*).  In recommending remand, the undersigned does not intend to suggest that the ALJ's RFC

finding could not be sustained under the new standard, only that discounting the VA's ratings requires greater explanation under *Bird*. *See Cobbs v. Colvin*, C.A. No. 1:12-CV-03472-JMC, 2014 WL 468928, at *8 (D.S.C. Feb. 4, 2014) (remanding for evaluation of VA ratings in accordance with the *Bird* standard).

***Remaining Allegations of Error***

In light of the court's recommendation that this matter be remanded for further consideration of the VA's disability ratings as discussed above, the court need not address the plaintiff's remaining allegations of error as they may be rendered moot on remand. *See Boone v. Barnhart*, 353 F.3d 203, 211 n.19 (3d Cir.2003) (remanding on other grounds and declining to address claimant's additional arguments). However, as part of the overall reconsideration of this claim upon remand, the Commissioner should consider the plaintiff's allegations that the vocational expert testimony did not support the ALJ's step five finding because the ALJ's hypothetical question did not include the sit/stand option that was included in the RFC assessment (doc. 18 at 21-26) and the ALJ did not properly explain his RFC assessment because he did not include any accommodation for the plaintiff's moderate difficulties in social functioning and failed to explain how the objective evidence supports a finding that the plaintiff can perform light work with a sit-stand option (*id.* at 27-31).

## **CONCLUSION AND RECOMMENDATION**

Now, therefore, based on the foregoing, it is recommended that the Commissioner's decision be reversed pursuant to sentence four of 42 U.S.C. § 405(g) and that the case be remanded to the Commissioner for further consideration as discussed above.

IT IS SO RECOMMENDED.

June 11, 2016                                          s/ Kevin F. McDonald
Greenville, South Carolina                   United States Magistrate Judge